(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ARMSTRONG ET AL. *v.* EXCEPTIONAL CHILD CENTER, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 14–15.　Argued January 20, 2015—Decided March 31, 2015

Providers of "habilitation services" under Idaho's Medicaid plan are reimbursed by the State's Department of Health and Welfare. Section 30(A) of the Medicaid Act requires Idaho's plan to "assure that payments are consistent with efficiency, economy, and quality of care" while "safeguard[ing] against unnecessary utilization of . . . care and services." 42 U. S. C. §1396a(a)(30)(A). Respondents, providers of habilitation services, sued petitioners, Idaho Health and Welfare Department officials, claiming that Idaho reimbursed them at rates lower than §30(A) permits, and seeking to enjoin petitioners to increase these rates. The District Court entered summary judgment for the providers. The Ninth Circuit affirmed, concluding that the Supremacy Clause gave the providers an implied right of action, and that they could sue under this implied right of action to seek an injunction requiring Idaho to comply with §30(a).

*Held*: The judgment is reversed.

567 Fed. Appx. 496, reversed.

　　JUSTICE SCALIA delivered the opinion of the Court, except as to Part IV, concluding that the Supremacy Clause does not confer a private right of action, and that Medicaid providers cannot sue for an injunction requiring compliance with §30(a). Pp. 3–10.

　　(a) The Supremacy Clause instructs courts to give federal law priority when state and federal law clash. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210. But it is not the "'source of any federal rights,'" *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 107, and certainly does not create a cause of action. Nothing in the Clause's text suggests otherwise, and nothing suggests it was ever understood as conferring

a private right of action. Article I vests Congress with broad discretion over the manner of implementing its enumerated powers. Art I., §8; *McCulloch* v. *Maryland*, 4 Wheat. 316, 421. It is unlikely that the Constitution gave Congress broad discretion with regard to the enactment of laws, while simultaneously limiting Congress's power over the manner of their implementation, making it impossible to leave the enforcement of federal law to federal actors. Pp. 3–5.

(b) Reading the Supremacy Clause not to confer a private right of action is consistent with this Court's preemption jurisprudence. The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England. This Court has never held nor suggested that this judge-made remedy, in its application to state officers, rests upon an implied right of action contained in the Supremacy Clause. Pp. 5–6.

(c) Respondents' suit cannot proceed in equity. The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. See, *e.g., Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 74. Here, the express provision of a single remedy for a State's failure to comply with Medicaid's requirements—the withholding of Medicaid funds by the Secretary of Health and Human Services, 42 U. S. C. §1396c—and the sheer complexity associated with enforcing §30(A) combine to establish Congress's "intent to foreclose" equitable relief, *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635, 647. Pp. 6–10.

SCALIA, J., delivered the opinion of the Court with respect to Parts I, II, and III, in which ROBERTS, C. J., and THOMAS, BREYER, and ALITO, JJ., joined, and an opinion with respect to Part IV, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined. BREYER, J., filed an opinion concurring in part and concurring in the judgment. SOTOMAYOR, J., filed a dissenting opinion, in which KENNEDY, GINSBURG, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–15

RICHARD ARMSTRONG, ET AL., PETITIONERS *v.*
EXCEPTIONAL CHILD CENTER, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 31, 2015]

JUSTICE SCALIA delivered the opinion of the Court, except as to Part IV.

We consider whether Medicaid providers can sue to enforce §(30)(A) of the Medicaid Act. 81 Stat. 911 (codified as amended at 42 U. S. C. §1396a(a)(30)(A)).

I

Medicaid is a federal program that subsidizes the States' provision of medical services to "families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." §1396–1. Like other Spending Clause legislation, Medicaid offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions.

In order to qualify for Medicaid funding, the State of Idaho adopted, and the Federal Government approved, a Medicaid "plan," §1396a(a), which Idaho administers through its Department of Health and Welfare. Idaho's plan includes "habilitation services"—in-home care for individuals who, "but for the provision of such services . . .

would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan," §1396n(c) and (c)(1). Providers of these services are reimbursed by the Department of Health and Welfare.

Section 30(A) of the Medicaid Act requires Idaho's plan to:

> "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . ." 42 U. S. C. §1396a(a)(30)(A).

Respondents are providers of habilitation services to persons covered by Idaho's Medicaid plan. They sued petitioners—two officials in Idaho's Department of Health and Welfare—in the United States District Court for the District of Idaho, claiming that Idaho violates §30(A) by reimbursing providers of habilitation services at rates lower than §30(A) permits. They asked the court to enjoin petitioners to increase these rates.

The District Court entered summary judgment for the providers, holding that Idaho had not set rates in a manner consistent with §30(A). *Inclusion, Inc.* v. *Armstrong,* 835 F. Supp. 2d 960 (2011). The Ninth Circuit affirmed. 567 Fed. Appx. 496 (2014). It said that the providers had "an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement or implementation of state legislation." *Id.,* at 497 (citing *Inde-*

*pendent Living Center of Southern Cal.* v. *Shewry*, 543 F. 3d 1050, 1065 (CA9 2008)). We granted certiorari. 573 U. S. \_\_\_ (2014).

## II

The Supremacy Clause, Art. VI, cl. 2, reads:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

It is apparent that this Clause creates a rule of decision: Courts "shall" regard the "Constitution," and all laws "made in Pursuance thereof," as "the supreme Law of the Land." They must not give effect to state laws that conflict with federal laws. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210 (1824). It is equally apparent that the Supremacy Clause is not the "'source of any federal rights,'" *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 107 (1989) (quoting *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 613 (1979)), and certainly does not create a cause of action. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so.

Hamilton wrote that the Supremacy Clause "only declares a truth, which flows immediately and necessarily from the institution of a Federal Government." The Federalist No. 33, p. 207 (J. Cooke ed. 1961). And Story described the Clause as "a positive affirmance of that, which is necessarily implied." 3 Commentaries on the Constitution of the United States §1831, p. 693 (1833). These descriptions would have been grossly inapt if the Clause

were understood to give affected parties a constitutional (and hence congressionally unalterable) right to enforce federal laws against the States. And had it been understood to provide such significant private rights against the States, one would expect to find that mentioned in the preratification historical record, which contained ample discussion of the Supremacy Clause by both supporters and opponents of ratification. See C. Drahozal, The Supremacy Clause: A Reference Guide to the United States Constitution 25 (2004); The Federalist No. 44, at 306 (J. Madison). We are aware of no such mention, and respondents have not provided any. Its conspicuous absence militates strongly against their position.

Additionally, it is important to read the Supremacy Clause in the context of the Constitution as a whole. Article I vests Congress with broad discretion over the manner of implementing its enumerated powers, giving it authority to "make all Laws which shall be necessary and proper for carrying [them] into Execution." Art. I, §8. We have said that this confers upon the Legislature "that discretion, with respect to the means by which the powers [the Constitution] confers are to be carried into execution, which will enable that body to perform the high duties assigned to it," *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819). It is unlikely that the Constitution gave Congress such broad discretion with regard to the enactment of laws, while simultaneously limiting Congress's power over the manner of their implementation, making it impossible to leave the enforcement of federal law to federal actors. If the Supremacy Clause includes a private right of action, then the Constitution *requires* Congress to permit the enforcement of its laws by private actors, significantly curtailing its ability to guide the implementation of federal law. It would be strange indeed to give a clause that makes federal law supreme a reading that *limits* Congress's power to enforce that law, by imposing mandatory

private enforcement—a limitation unheard-of with regard to state legislatures.

To say that the Supremacy Clause does not confer a right of action is not to diminish the significant role that courts play in assuring the supremacy of federal law. For once a case or controversy properly comes before a court, judges are bound by federal law. Thus, a court may not convict a criminal defendant of violating a state law that federal law prohibits. See, *e.g., Pennsylvania* v. *Nelson*, 350 U. S. 497, 499, 509 (1956). Similarly, a court may not hold a civil defendant liable under state law for conduct federal law requires. See, *e.g., Mutual Pharmaceutical Co.* v. *Bartlett*, 570 U. S. ___, ___–___ (2013) (slip op., at 13–14). And, as we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted. *Ex parte Young*, 209 U. S. 123, 155–156 (1908).

Respondents contend that our preemption jurisprudence—specifically, the fact that we have regularly considered whether to enjoin the enforcement of state laws that are alleged to violate federal law—demonstrates that the Supremacy Clause creates a cause of action for its violation. They are incorrect. It is true enough that we have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. See, *e.g., Osborn* v. *Bank of United States,* 9 Wheat. 738, 838–839, 844 (1824); *Ex parte Young*, *supra*, at 150–151 (citing *Davis* v. *Gray*, 16 Wall. 203, 220 (1873)). But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials. See *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, 110 (1902); see generally L. Jaffe, Judicial Control of Administrative Action 152–196 (1965). Thus, the Supremacy Clause need

not be (and in light of our textual analysis above, cannot be) the explanation. What our cases demonstrate is that, "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." *Carroll* v. *Safford*, 3 How. 441, 463 (1845).

The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England. See Jaffe & Henderson, Judicial Review and the Rule of Law: Historical Origins, 72 L. Q. Rev. 345 (1956). It is a judge-made remedy, and we have never held or even suggested that, in its application to state officers, it rests upon an implied right of action contained in the Supremacy Clause. That is because, as even the dissent implicitly acknowledges, *post*, at 4 (opinion of SOTOMAYOR, J.) it does not. The Ninth Circuit erred in holding otherwise.

## III

### A

We turn next to respondents' contention that, quite apart from any cause of action conferred by the Supremacy Clause, this suit can proceed against Idaho in equity.

The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. See, *e.g., Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 74 (1996). "'Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.'" *INS* v. *Pangilinan*, 486 U. S. 875, 883 (1988) (quoting *Hedges* v. *Dixon County*, 150 U. S. 182, 192 (1893); brackets omitted). In our view the Medicaid Act implicitly precludes private enforcement of §30(A), and respondents cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement. See *Douglas* v. *Independent Living Center of Southern Cal., Inc.*, 565 U. S. ___, ___–___

(2012) (ROBERTS, C. J., dissenting) (slip op., at 4–5).

Two aspects of §30(A) establish Congress's "intent to foreclose" equitable relief. *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635, 647 (2002). First, the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements—for the State's "breach" of the Spending Clause contract—is the withholding of Medicaid funds by the Secretary of Health and Human Services. 42 U. S. C. §1396c. As we have elsewhere explained, the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander* v. *Sandoval*, 532 U. S. 275, 290 (2001).

The provision for the Secretary's enforcement by withholding funds might not, *by itself*, preclude the availability of equitable relief. See *Virginia Office for Protection and Advocacy* v. *Stewart*, 563 U. S. 247, \_\_\_–\_\_\_, n. 3 (2011) (slip op., at 7–8, n. 3). But it does so when combined with the judicially unadministrable nature of §30(A)'s text. It is difficult to imagine a requirement broader and less specific than §30(A)'s mandate that state plans provide for payments that are "consistent with efficiency, economy, and quality of care," all the while "safeguard[ing] against unnecessary utilization of . . . care and services." Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes, we think, that Congress "wanted to make the agency remedy that it provided exclusive," thereby achieving "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking," and avoiding "the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action." *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 292 (2002) (BREYER, J., concurring in judgment). The sheer complexity associated with enforcing §30(A), coupled with

the express provision of an administrative remedy, §1396c, shows that the Medicaid Act precludes private enforcement of §30(A) in the courts.

B

The dissent agrees with us that the Supremacy Clause does not provide an implied right of action, and that Congress may displace the equitable relief that is traditionally available to enforce federal law. It disagrees only with our conclusion that such displacement has occurred here.

The dissent insists that, "because Congress is undoubtedly aware of the federal courts' long-established practice of enjoining preempted state action, it should generally be presumed to contemplate such enforcement unless it *affirmatively* manifests a contrary intent." *Post,* at 4 (emphasis added). But a "long-established practice" does not justify a rule that denies statutory text its fairest reading. Section 30(A), fairly read in the context of the Medicaid Act, "display[s] a[n] intent to foreclose" the availability of equitable relief. *Verizon*, *supra*, at 647. We have no warrant to revise Congress's scheme simply because it did not "affirmatively" preclude the availability of a judge-made action at equity. See *Seminole Tribe*, *supra,* at 75 (inferring, in the absence of an "affirmative" statement by Congress, that equitable relief was unavailable).

Equally unavailing is the dissent's reliance on §30(A)'s history. Section 30(A) was amended, on December 19, 1989, to include what the dissent calls the "equal access mandate," *post*, at 9—the requirement that reimbursement rates be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." §6402(a), 103 Stat. 2260. There existed at the time another provision, known as the "Boren Amendment," that likewise imposed broad requirements on state Medicaid plans. 42 U. S. C.

§1396a(a)(13)(A) (1982 ed., Supp. V). Lower courts had interpreted the Boren Amendment to be privately enforceable under §1983. From this, the dissent infers that, when Congress amended §30(A), it could not "have failed to anticipate" that §30(A)'s broad language—or at least that of the equal access mandate—would be interpreted as enforceable in a private action. Thus, concludes the dissent, Congress's failure to *expressly* preclude the private enforcement of §30(A) suggests it intended *not to* preclude private enforcement. *Post,* at 10.

This argument appears to rely on the prior-construction canon; the rule that, when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute" is presumed to incorporate that interpretation. *Bragdon* v. *Abbott*, 524 U. S. 624, 645 (1998). But that canon has no application here. The language of the two provisions is nowhere near identical; and even if it had been, the question whether the Boren Amendment permitted private actions was far from "settled." When Congress amended §30(A) in 1989, this Court had already granted certiorari to decide, but had not yet decided, whether the Boren Amendment could be enforced through a §1983 suit. See *Baliles* v. *Virginia Hospital Assn.*, 493 U. S. 808 (Oct. 2, 1989) (granting certiorari). Our decision permitting a §1983 action did not issue until June 14, 1990—almost six months after the amendment to §30(A). *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498.* The existence of a granted petition for certiorari demonstrates quite clearly that the

―――――――

*Respondents do not claim that *Wilder* establishes precedent for a private cause of action in this case. They do not assert a §1983 action, since our later opinions plainly repudiate the ready implication of a §1983 action that *Wilder* exemplified. See *Gonzaga, Univ.* v. *Doe*, 536 U. S. 273, 283 (2002) (expressly "reject[ing] the notion," implicit in *Wilder*, "that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under §1983").

question whether the Boren Amendment could be privately enforced was *un*settled at the time of §30(A)'s 1989 amendment—so that if Congress was aware of the parallel (which is highly doubtful) the course that awareness would have prompted (if any) would not have been legislative silence but rather express specification of the availability of private enforcement (if that was what Congress intended).

Finally, the dissent speaks as though we leave these plaintiffs with no resort. That is not the case. Their relief must be sought initially through the Secretary rather than through the courts. The dissent's complaint that the sanction available to the Secretary (the cut-off of funding) is too massive to be a realistic source of relief seems to us mistaken. We doubt that the Secretary's notice to a State that its compensation scheme is inadequate will be ignored.

## IV

The last possible source of a cause of action for respondents is the Medicaid Act itself. They do not claim that, and rightly so. Section 30(A) lacks the sort of rights-creating language needed to imply a private right of action. *Sandoval, supra* at 286–287. It is phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid. The Act says that the "Secretary shall approve any plan which fulfills the conditions specified in subsection (a)," the subsection that includes §30(A). 42 U. S. C. §1396a(b). We have held that such language "reveals no congressional intent to create a private right of action." *Sandoval, supra* at 289; see also *Universities Research Assn., Inc.* v. *Coutu,* 450 U. S. 754, 772 (1981). And again, the explicitly conferred means of enforcing compliance with §30(A) by the Secretary's withholding

funding, §1396c, suggests that other means of enforcement are precluded, *Sandoval, supra,* at 290.

Spending Clause legislation like Medicaid "is much in the nature of a contract." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). The notion that respondents have a right to sue derives, perhaps, from the fact that they are beneficiaries of the federal-state Medicaid agreement, and that intended beneficiaries, in modern times at least, can sue to enforce the obligations of private contracting parties. See 13 R. Lord, Williston on Contracts §§37:12–37.13, pp. 123–135 (4th ed. 2013). We doubt, to begin with, that providers are intended beneficiaries (as opposed to mere incidental beneficiaries) of the Medicaid agreement, which was concluded for the benefit of the infirm whom the providers were to serve, rather than for the benefit of the providers themselves. See *Pharmaceutical Research and Mfrs. of America* v. *Walsh*, 538 U. S. 644, 683 (2003) (THOMAS, J., concurring in judgment). More fundamentally, however, the modern jurisprudence permitting intended beneficiaries to sue does not generally apply to contracts between a private party and the government, *Astra USA, Inc.* v. *Santa Clara County*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 6); see Williston, *supra*, at §§37:35–37:36, at 256–271; 9 J. Murray, Corbin on Contracts §45.6, p. 92 (rev. ed. 2007)—much less to contracts between two governments. Our precedents establish that a private right of action under federal law is not created by mere implication, but must be "unambiguously conferred," *Gonzaga*, 536 U. S., at 283. Nothing in the Medicaid Act suggests that Congress meant to change that for the commitments made under §30(A).

\*    \*    \*

The judgment of the Ninth Circuit Court of Appeals is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

## No. 14–15

_____

## RICHARD ARMSTRONG, ET AL., PETITIONERS *v.* EXCEPTIONAL CHILD CENTER, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 31, 2015]

JUSTICE BREYER, concurring in part and concurring in the judgment.

I join Parts I, II, and III of the Court's opinion.

Like all other Members of the Court, I would not characterize the question before us in terms of a Supremacy Clause "cause of action." Rather, I would ask whether "federal courts may in [these] circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Ante,* at 5; *post,* at 4 (SOTOMAYOR, J., dissenting). I believe the answer to this question is no.

That answer does not follow from the application of a simple, fixed legal formula separating federal statutes that may underlie this kind of injunctive action from those that may not. "[T]he statute books are too many, the laws too diverse, and their purposes too complex, for any single legal formula to offer" courts "more than general guidance." *Gonzaga Univ.* v. *Doe,* 536 U. S. 273, 291 (2012) (BREYER, J., concurring in judgment). Rather, I believe that several characteristics of the federal statute before us, when taken together, make clear that Congress intended to foreclose respondents from bringing this particular action for injunctive relief.

For one thing, as the majority points out, §30(A) of the Medicaid Act, 42 U. S. C. §1396a(a)(30)(A), sets forth a

federal mandate that is broad and nonspecific.  See *ante,* at 7.  But, more than that, §30(A) applies its broad standards to the setting of rates.  The history of ratemaking demonstrates that administrative agencies are far better suited to this task than judges.  More than a century ago, Congress created the Interstate Commerce Commission, the first great federal regulatory rate-setting agency, and endowed it with authority to set "reasonable" railroad rates.  Ch. 104, 24 Stat. 379 (1887).  It did so in part because judicial efforts to maintain reasonable rate levels had proved inadequate.  See I. Sharfman, Railway Regulation: An Analysis of the Underlying Problems in Railway Economics from the Standpoint of Government Regulation 43–44 (1915).

Reading §30(A) underscores the complexity and nonjudicial nature of the rate-setting task.  That provision requires State Medicaid plans to "assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers" to assure "care and services" equivalent to that "available to the general population in the geographic area."  §1396a(a)(30)(A).  The methods that a state agency, such as Idaho's Department of Health and Welfare, uses to make this kind of determination may involve subsidiary determinations of, for example, the actual cost of providing quality services, including personnel and total operating expenses; changes in public expectations with respect to delivery of services; inflation; a comparison of rates paid in neighboring States for comparable services; and a comparison of any rates paid for comparable services in other public or private capacities.  See App. to Reply to Brief in Opposition 16; Idaho Code Ann. §56–118 (2012).

At the same time, §30(A) applies broadly, covering reimbursements provided to approximately 1.36 million doctors, serving over 69 million patients across the Nation.  See Dept. of Health and Human Servs., Office of Inspector

General, Access to Care: Provider Availability in Medicaid Managed Care 1, 5 (Dec. 2014). And States engage in time-consuming efforts to obtain public input on proposed plan amendments. See, *e.g.,* Kansas Medicaid: Design and Implementation of a Public Input and Stakeholder Consult Process (Sept. 16, 2011) (prepared by Deloitte Consulting, LLP) (describing public input on Kansas' proposed Medicaid amendments).

I recognize that federal courts have long become accustomed to reviewing for reasonableness or constitutionality the rate-setting determinations made by agencies. See 5 U. S. C. §706; *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 602–606 (1944). But this is not such an action. Instead, the lower courts here, relying on the rate-setting standard articulated in *Orthopaedic Hospital* v. *Belshe*, 103 F. 3d 1491 (CA9 1997), required the State to set rates that "approximate the cost of quality care provided efficiently and economically." *Id.,* at 1496. See *Inclusion, Inc.* v. *Armstrong*, 835 F. Supp. 2d 960, 963–964 (Idaho 2011), aff'd, 567 Fed. Appx. 496 (CA9 2014). To find in the law a basis for courts to engage in such direct rate-setting could set a precedent for allowing other similar actions, potentially resulting in rates set by federal judges (of whom there are several hundred) outside the ordinary channel of federal judicial review of agency decisionmaking. The consequence, I fear, would be increased litigation, inconsistent results, and disorderly administration of highly complex federal programs that demand public consultation, administrative guidance and coherence for their success. I do not believe Congress intended to allow a statute-based injunctive action that poses such risks (and that has the other features I mention).

I recognize that courts might in particular instances be able to resolve rate-related requests for injunctive relief quite easily. But I see no easy way to separate in advance the potentially simple sheep from the more harmful rate-

making goats. In any event, this case, I fear, belongs in the latter category. See *Belshe*, *supra,* at 1496. Compare Brief for Respondents 2, n. 1 (claiming that respondents seek only to enforce federally approved methodology), with Brief for United States as *Amicus Curiae* 5, n. 2 (the relevant methodology has not been approved). See also Idaho Code Ann. §56–118 (describing in general terms what appears to be a complex rate-setting methodology, while leaving unclear the extent to which Idaho is bound to use, rather than merely consider, actual provider costs).

For another thing, like the majority, I would ask why, in the complex rate-setting area, other forms of relief are inadequate. If the Secretary of Health and Human Services concludes that a State is failing to follow legally required federal rules, the Secretary can withhold federal funds. See *ante,* at 7 (citing 42 U. S. C. §1396c). If withholding funds does not work, the federal agency may be able to sue a State to compel compliance with federal rules. See Tr. of Oral Arg. 23, 52 (Solicitor General and respondents acknowledging that the Federal Government might be able to sue a State to enjoin it from paying less than what §30(A) requires). Cf., *e.g., Arizona* v. *United States*, 567 U. S. __ (2012) (allowing similar action in another context).

Moreover, why could respondents not ask the federal agency to interpret its rules to respondents' satisfaction, to modify those rules, to promulgate new rules or to enforce old ones? See 5 U. S. C. §553(e). Normally, when such requests are denied, an injured party can seek judicial review of the agency's refusal on the grounds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." §§702, 706(2)(A). And an injured party can ask the court to "compel agency action unlawfully withheld or unreasonably delayed." §§702, 706(1). See also Tr. of Oral Arg. 15–16 (arguing that providers can bring an action under the Administrative

Procedure Act (APA) whenever a waiver program is renewed or can seek new agency rulemaking); *Japan Whaling Assn.* v. *American Cetacean Soc.*, 478 U. S. 221, 230, n. 4, 231 (1986) (APA challenge to the Secretary of Commerce's failure to act).

I recognize that the law may give the federal agency broad discretionary authority to decide when and how to exercise or to enforce statutes and rules. See *Massachusetts* v. *EPA*, 549 U. S. 497, 527 (2007). As a result, it may be difficult for respondents to prevail on an APA claim unless it stems from an agency's particularly egregious failure to act. But, if that is so, it is because Congress decided to vest broad discretion in the agency to interpret and to enforce §30(A). I see no reason for this Court to circumvent that congressional determination by allowing this action to proceed.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–15

_____

RICHARD ARMSTRONG, ET AL., PETITIONERS *v.*
EXCEPTIONAL CHILD CENTER, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 31, 2015]

JUSTICE SOTOMAYOR, with whom JUSTICE KENNEDY, JUSTICE GINSBURG, and JUSTICE KAGAN join, dissenting.

Suits in federal court to restrain state officials from executing laws that assertedly conflict with the Constitution or with a federal statue are not novel. To the contrary, this Court has adjudicated such requests for equitable relief since the early days of the Republic. Nevertheless, today the Court holds that Congress has foreclosed private parties from invoking the equitable powers of the federal courts to require States to comply with §30(A) of the Medicaid Act, 42 U. S. C. §1396a(a)(30)(A). It does so without pointing to the sort of detailed remedial scheme we have previously deemed necessary to establish congressional intent to preclude resort to equity. Instead, the Court relies on Congress' provision for agency enforcement of §30(A)—an enforcement mechanism of the sort we have already definitively determined *not* to foreclose private actions—and on the mere fact that §30(A) contains relatively broad language. As I cannot agree that these statutory provisions demonstrate the requisite congressional intent to restrict the equitable authority of the federal courts, I respectfully dissent.

# I
## A

That parties may call upon the federal courts to enjoin unconstitutional government action is not subject to serious dispute. Perhaps the most famous exposition of this principle is our decision in *Ex parte Young*, 209 U. S. 123 (1908), from which the doctrine derives its usual name. There, we held that the shareholders of a railroad could seek an injunction preventing the Minnesota attorney general from enforcing a state law setting maximum railroad rates because the Eleventh Amendment did not provide the officials with immunity from such an action and the federal court had the "power" in equity to "grant a temporary injunction." *Id.,* at 148. This Court had earlier recognized similar equitable authority in *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824), in which a federal court issued an injunction prohibiting an Ohio official from executing a state law taxing the Bank of the United States. *Id.,* at 838–839. We affirmed in relevant part, concluding that the case was "cognizable in a Court of equity," and holding it to be "proper" to grant equitable relief insofar as the state tax was "repugnant" to the federal law creating the national bank. *Id.,* at 839, 859. More recently, we confirmed the vitality of this doctrine in *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010). There, we found no support for the argument that a challenge to "'governmental action under the Appointments Clause or separation-of-powers principles'" should be treated "differently than every other constitutional claim" for which "equitable relief 'has long been recognized as the proper means for preventing entities from acting unconstitutionally.'" *Id.,* at 491, n. 2.

A suit, like this one, that seeks relief against state officials acting pursuant to a state law allegedly preempted by a federal statute falls comfortably within this doc-

trine.  A claim that a state law contravenes a federal statute is "basically constitutional in nature, deriving its force from the operation of the Supremacy Clause," *Douglas* v. *Seacoast Products, Inc.*, 431 U. S. 265, 271–272 (1977), and the application of preempted state law is therefore "unconstitutional," *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 388 (2000); accord, *e.g., McCulloch* v. *Maryland*, 4 Wheat. 316, 436 (1819) (that States have "no power" to enact laws interfering with "the operations of the constitutional laws enacted by Congress" is the "unavoidable consequence of that supremacy which the constitution has declared"; such a state law "is unconstitutional and void").  We have thus long entertained suits in which a party seeks prospective equitable protection from an injurious and preempted state law without regard to whether the federal statute at issue itself provided a right to bring an action.  See, *e.g., Foster* v. *Love*, 522 U. S. 67 (1997) (state election law that permitted the winner of a state primary to be deemed the winner of election to Congress held preempted by federal statute setting date of congressional elections); *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85 (1983) (state law preempted in part by the federal Employee Retirement Income Security Act of 1974); *Railroad Transfer Service, Inc.* v. *Chicago*, 386 U. S. 351 (1967) (city ordinance imposing licensing requirements on motor carrier transporting railroad passengers held preempted by federal Interstate Commerce Act); *Campbell* v. *Hussey*, 368 U. S. 297 (1961) (state law requiring labeling of certain strains of tobacco held preempted by the federal Tobacco Inspection Act); *Railway Co.* v. *McShane*, 22 Wall. 444 (1875) (state taxation of land possessed by railroad company held invalid under federal Act of July 2, 1864).  Indeed, for this reason, we have characterized "the availability of prospective relief of the sort awarded in *Ex parte Young*" as giving "life to the Supremacy Clause." *Green* v. *Mansour*, 474 U. S. 64, 68

(1985).

Thus, even though the Court is correct that it is somewhat misleading to speak of "an implied right of action contained in the Supremacy Clause," *ante*, at 6, that does not mean that parties may not enforce the Supremacy Clause by bringing suit to enjoin preempted state action. As the Court also recognizes, we "have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Ante*, at 5.

B

Most important for purposes of this case is not the mere existence of this equitable authority, but the fact that it is exceedingly well established—supported, as the Court puts it, by a "long history." *Ante*, at 6. Congress may, if it so chooses, either expressly or implicitly preclude *Ex parte Young* enforcement actions with respect to a particular statute or category of lawsuit. See, *e.g.,* 28 U. S. C. §1341 (prohibiting federal judicial restraints on the collection of state taxes); *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 75–76 (1996) (comprehensive alternative remedial scheme can establish Congress' intent to foreclose *Ex parte Young* actions). But because Congress is undoubtedly aware of the federal courts' long-established practice of enjoining preempted state action, it should generally be presumed to contemplate such enforcement unless it affirmatively manifests a contrary intent. "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 398 (1946).

In this respect, equitable preemption actions differ from suits brought by plaintiffs invoking 42 U. S. C. §1983 or an implied right of action to enforce a federal statute. Suits

for "redress designed to halt or prevent the constitutional violation rather than the award of money damages" seek "traditional forms of relief." *United States* v. *Stanley*, 483 U. S. 669, 683 (1987). By contrast, a plaintiff invoking §1983 or an implied statutory cause of action may seek a variety of remedies—including damages—from a potentially broad range of parties. Rather than simply pointing to background equitable principles authorizing the action that Congress presumably has not overridden, such a plaintiff must demonstrate specific congressional intent to *create* a statutory right to these remedies. See *Gonzaga Univ.* v. *Doe,* 536 U. S. 273, 290 (2002); *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001); see also *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 114 (1989) (KENNEDY, J., dissenting) (Because a preemption claim does not seek to enforce a statutory right, "[t]he injured party does not need §1983 to vest in him a right to assert that an attempted exercise of jurisdiction or control violates the proper distribution of powers within the federal system"). For these reasons, the principles that we have developed to determine whether a statute creates an implied right of action, or is enforceable through §1983, are not transferable to the *Ex parte Young* context.

## II

In concluding that Congress has "implicitly preclude[d] private enforcement of §30(A)," *ante,* at 6, the Court ignores this critical distinction and threatens the vitality of our *Ex parte Young* jurisprudence. The Court identifies only a single prior decision—*Seminole Tribe*—in which we have ever discerned such congressional intent to foreclose equitable enforcement of a statutory mandate. *Ante*, at 6. Even the most cursory review of that decision reveals how far afield it is from this case.

In *Seminole Tribe*, the plaintiff Indian Tribe had invoked *Ex parte Young* in seeking to compel the State of

Florida to "negotiate in good faith with [the] tribe toward the formation of a compact" governing certain gaming activities, as required by a provision of the Indian Gaming Regulatory Act, 25 U. S. C. §2710(d)(3). 517 U. S., at 47. We rejected this effort, observing that "Congress passed §2710(d)(3) in conjunction with the carefully crafted and intricate remedial scheme set forth in §2710(d)(7)." *Id.,* at 73–74. That latter provision allowed a tribe to sue for violations of the duty to negotiate 180 days after requesting such negotiations, but specifically limited the remedy that a court could grant to "an order directing the State and the Indian tribe to conclude a compact within 60 days," and provided that the only sanction for the violation of such an order would be to require the parties to "submit a proposed compact to a mediator." *Id.,* at 74; §§2710(d)(7)(B)(i), (iii), (iv). The statute further directed that if the State should fail to abide by the mediator's selected compact, the sole remedy would be for the Secretary of the Interior, in consultation with the tribe, to prescribe regulations governing gaming. See 517 U. S., at 74–75; §2710(d)(7)(B)(vii). We concluded that Congress must have intended this procedural route to be the exclusive means of enforcing §2710(d)(3). As we explained: "If §2710(d)(3) could be enforced in a suit under *Ex parte Young*, §2710(d)(7) would have been superfluous; it is difficult to see why an Indian tribe would suffer through the intricate scheme of §2710(d)(7) when more complete and more immediate relief would be available under *Ex parte Young*." 517 U. S., at 75.

What is the equivalent "carefully crafted and intricate remedial scheme" for enforcement of §30(A)? The Court relies on two aspects of the Medicaid Act, but, whether considered separately or in combination, neither suffices.

First, the Court cites 42 U. S. C. §1396c, which authorizes the Secretary of Health and Human Services (HHS) to withhold federal Medicaid payments to a State in whole or

in part if the Secretary determines that the State has failed to comply with the obligations set out in §1396a, including §30(A). See *ante,* at 7–8. But in striking contrast to the remedial provision set out in the Indian Gaming Regulatory Act, §1396c provides no specific procedure that parties actually affected by a State's violation of its statutory obligations may invoke in lieu of *Ex parte Young*—leaving them without any other avenue for seeking relief from the State. Nor will §1396c always provide a particularly effective means for redressing a State's violations: If the State has violated §30(A) by refusing to reimburse medical providers at a level "sufficient to enlist enough providers so that care and services are available" to Medicaid beneficiaries to the same extent as they are available to "the general population," agency action resulting in a reduced flow of federal funds to that State will often be self-defeating. §1396a(30)(A); see Brief for Former HHS Officials as *Amici Curiae* 18 (noting that HHS is often reluctant to initiate compliance actions because a "state's non-compliance creates a damned-if-you-do, damned-if-you-don't scenario where the withholding of state funds will lead to depriving the poor of essential medical assistance"). Far from rendering §1396c "superfluous," then, *Ex parte Young* actions would seem to be an anticipated and possibly necessary supplement to this limited agency-enforcement mechanism. *Seminole Tribe*, 517 U. S., at 75. Indeed, presumably for these reasons, we recently rejected the very contention the Court now accepts, holding that "[t]he fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds . . . does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under *Ex parte Young*." *Virginia Office for Protection and Advocacy* v. *Stewart*, 563 U. S. 247, \_\_\_\_–\_\_\_\_, n. 3 (2011) (slip op., at 7–8, n. 3)

(internal quotation marks omitted).

Section 1396c also parallels other provisions scattered throughout the Social Security Act that likewise authorize the withholding of federal funds to States that fail to fulfill their obligations. See, *e.g.*, §§609(a), 1204, 1354. Yet, we have consistently authorized judicial enforcement of the Act. See *Maine* v. *Thiboutot*, 448 U. S. 1, 6 (1980) (collecting cases). *Rosado* v. *Wyman*, 397 U. S. 397 (1970), provides a fitting illustration. There, we considered a provision of the Social Security Act mandating that, in calculating benefits for participants in the Aid to Families with Dependent Children Program, States make adjustments "'to reflect fully changes in living costs.'" *Id.,* at 412 (quoting §602(a)(23) (1964 ed., Supp. IV)). We expressed no hesitation in concluding that federal courts could require compliance with this obligation, explaining: "It is . . . peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use." *Id.,* at 422–423. We so held notwithstanding the existence of an enforcement provision permitting a federal agency to "make a total or partial cutoff of federal funds." See *id.,* at 406, n. 8 (citing §1316).

Second, perhaps attempting to reconcile its treatment of §1396c (2012 ed.) with this longstanding precedent, the Court focuses on the particular language of §30(A), contending that this provision, at least, is so "judicially unadministrable" that Congress must have intended to preclude its enforcement in private suits. *Ante,* at 7. Admittedly, the standard set out in §30(A) is fairly broad, requiring that a state Medicaid plan:

> "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to

safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." §1396a(a)(30)(A).

But mere breadth of statutory language does not require the Court to give up all hope of judicial enforcement—or, more important, to infer that Congress must have done so.

In fact, the contention that §30(A)'s language was intended to foreclose private enforcement actions entirely is difficult to square with the provision's history. The specific equal access mandate invoked by the plaintiffs in this case—that reimbursement rates be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area"—was added to §30(A) in 1989. 103 Stat. 2260. At that time, multiple Federal Courts of Appeals had held that the so-called Boren Amendment to the Medicaid Act was enforceable pursuant to §1983—as we soon thereafter concluded it was. See *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498, 504–505, 524 (1990). The Boren Amendment employed language quite similar to that used in §30(A), requiring that a state plan:

"provide . . . for payment . . . of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates . . . which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care

and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access . . . to in-patient hospital services of adequate quality." §1396a(a)(13)(A) (1982 ed., Supp. V).

It is hard to believe that the Congress that enacted the operative version of §30(A) could have failed to anticipate that it might be similarly enforceable. Even if, as the Court observes, the question whether the Boren Amendment was enforceable under §1983 was "unsettled at the time," *ante*, at 10 (emphasis deleted), surely Congress would have spoken with far more clarity had it actually intended to preclude private enforcement of §30(A) through not just §1983 but also *Ex parte Young*.

Of course, the broad scope of §30(A)'s language is not irrelevant. But rather than compelling the conclusion that the provision is wholly unenforceable by private parties, its breadth counsels in favor of interpreting §30(A) to provide substantial leeway to States, so that only in rare and extreme circumstances could a State actually be held to violate its mandate. The provision's scope may also often require a court to rely on HHS, which is "comparatively expert in the statute's subject matter." *Douglas* v. *Independent Living Center of Southern Cal., Inc.*, 565 U. S ___, ___ (2012) (slip op., at 7). When the agency has made a determination with respect to what legal standard should apply, or the validity of a State's procedures for implementing its Medicaid plan, that determination should be accorded the appropriate deference. See, *e.g., Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984); *Skidmore* v. *Swift & Co.*, 323 U. S. 134 (1944). And if faced with a question that presents a special demand for agency expertise, a court might call for the views of the agency, or refer the question

to the agency under the doctrine of primary jurisdiction. See *Rosado*, 397 U. S., at 406–407; *Pharmaceutical Research and Mfrs. of America* v. *Walsh*, 538 U. S. 644, 673 (2003) (BREYER, J., concurring in part and concurring in judgment). Finally, because the authority invoked for enforcing §30(A) is equitable in nature, a plaintiff is not entitled to relief as of right, but only in the sound discretion of the court. See *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 542 (1987). Given the courts' ability to both respect States' legitimate choices and defer to the federal agency when necessary, I see no basis for presuming that Congress believed the Judiciary to be completely incapable of enforcing §30(A).\*

————————

\*That is not to say that the Court of Appeals in this case necessarily applied §30(A) correctly. Indeed, there are good reasons to think the court construed §30(A) to impose an overly stringent obligation on the States. While the Ninth Circuit has understood §30(A) to compel States to "rely on responsible cost studies," and to reimburse for services at rates that "approximate the cost of quality care provided efficiently and economically," *Orthopaedic Hospital* v. *Belshe*, 103 F. 3d 1491, 1496 (1997), other courts have read §30(A) to require only that rates be high enough to ensure that services are *available* to Medicaid participants. See *Pennsylvania Pharmacists Assn.* v. *Houstoun*, 283 F. 3d 531, 538 (CA3 2002); *Evergreen Presbyterian Ministries, Inc.* v. *Hood*, 235 F. 3d 908, 928–929 (CA5 2000); *Methodist Hospitals, Inc.* v. *Sullivan*, 91 F. 3d 1026, 1030 (CA7 1996). This Court declined to grant certiorari to address whether the Ninth Circuit's reading of §30(A) is correct. See 573 U. S. ___ (2014). But JUSTICE BREYER, in his concurrence, appears to mistake that question about the merits of the Ninth Circuit's standard for the question this Court actually granted certiorari to address—that is, whether §30 is judicially enforceable at all. See *ante,* at 3–4 (opinion concurring in part and concurring in judgment). To answer that question, one need only recognize, as JUSTICE BREYER does, that "federal courts have long become accustomed to reviewing for reasonableness or constitutionality the rate-setting determinations made by agencies." *Ante*, at 3. A private party who invokes the jurisdiction of the federal courts in order to enjoin a state agency's implementation of rates that are so unreasonably low as to violate §30(A) seeks a determination of exactly this sort.

\*    \*    \*

In sum, far from identifying a "carefully crafted . . . remedial scheme" demonstrating that Congress intended to foreclose *Ex parte Young* enforcement of §30(A), *Seminole Tribe,* 517 U. S., at 73–74, the Court points only to two provisions. The first is §1396c, an agency-enforcement provision that, given our precedent, cannot preclude private actions. The second is §30(A) itself, which, while perhaps broad, cannot be understood to manifest congressional intent to preclude judicial involvement.

The Court's error today has very real consequences. Previously, a State that set reimbursement rates so low that providers were unwilling to furnish a covered service for those who need it could be compelled by those affected to respect the obligation imposed by §30(A). Now, it must suffice that a federal agency, with many programs to oversee, has authority to address such violations through the drastic and often counterproductive measure of withholding the funds that pay for such services. Because a faithful application of our precedents would have led to a contrary result, I respectfully dissent.